UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; and ALLSTATE NORTH AMERICAN INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>FLORIDA ORTHOPEDICS AND NEUROSURGERY, LLC; BRADFORD ESTRA; and ANGEL RIGUERAS, M.D.,<br><br>Defendants. | Civil Action No. _____<br><br>**Demand for Jury Trial** |

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company (collectively, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.    INTRODUCTION

1.    This is a case about a medical clinic that purports to render medical services and its owners, managers, agents, and representatives who engaged in a

1

scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, bills, and invoices through the U.S. Mail and faxes sent over state lines seeking to collect payment from Allstate for medical services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.    The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

3.    All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.    By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-501.213; (3) common law fraud; (4) civil conspiracy; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by and on behalf of the defendants are compensable.

5.    As a result of the defendants' fraudulent acts, Allstate has paid millions of dollars to resolve insurance claims that were based on the false, fabricated, unlawful, and improper medical services at issue in this Complaint.

## II.    THE PARTIES

### A.    PLAINTIFFS

6.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company are each duly organized and existing under the laws of the State of Illinois.

7.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company each have their respective principal places of business in Northbrook, Illinois.

8.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Florida.

### B.    DEFENDANTS

#### 1.    Florida Orthopedics and Neurosurgery, LLC

9.    Defendant Florida Orthopedics and Neurosurgery, LLC is organized under the laws of the State of Florida.

10.    Florida Orthopedics and Neurosurgery, LLC does business using the name University Orthopedic Care (hereinafter referred to as "University Orthopedic").

3

11. University Orthopedic provides healthcare services and tenders charges for reimbursement for such services to third parties, including insurance companies like Allstate.

12. At all relevant times, University Orthopedic was operated and conducted by defendants Bradford Estra ("Estra") and Angel Rigueras, M.D. ("Rigueras").

13. University Orthopedic billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several patients, including those identified in Exhibit 1.

### 2. **Bradford Estra**

14. Defendant Bradford Estra is a resident and citizen of the State of Florida.

15. At all times relevant to this Complaint, Estra owned and controlled defendant University Orthopedic.

### 3. **Angel Rigueras, M.D.**

16. Defendant Angel Rigueras, M.D. is a resident and citizen of the State of Florida.

17. At all times relevant to this Complaint, Rigueras operated and controlled defendant University Orthopedic.

4

## III.    JURISDICTION AND VENUE

18.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

19.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

20.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the majority of the acts at issue in this Complaint were carried out within the Middle District of Florida.

## IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

21.    University Orthopedic, by and through Estra and Rigueras, submitted exorbitant charges to Allstate for purported medical services, procedures, and testing that were not actually provided, were not medically necessary, and were fraudulently billed.

22.    As detailed below, University Orthopedic's standard practices that were instituted by laypeople, including defendant Estra, encouraged unnecessary and excessive surgeries, medications, evaluations, diagnostic tests, pain management procedures, durable medical equipment ("DME"), and more.

23.    To process patients at a high volume and to generate large bills as quickly as possible, the defendants used a variety of fraudulent methods, including

5

billing for services not provided at all; entering into illegal kickback arrangements with other providers; fabricating, exaggerating, and falsifying records; failing to comply with statutes and regulations governing the provision of healthcare services; routinely double- and triple-billing for claimed services; paying monetary inducements to physicians to order and perform services; and billing for excessive and unnecessary services.

24.    The defendants maintained agreements with several law firms who sent their clients to University Orthopedic because University Orthopedic agreed to and did in fact generate enormous charges regardless of patients' actual medical conditions (if any).

25.    These charges were used to increase the perceived value of insurance claims and used to extract payments from Allstate.

26.    Many of the patients at issue herein were seeking little or no medical treatment on their own before they were steered by attorneys to University Orthopedic (pursuant to the agreements between University Orthopedic and the attorneys) in order to bolster the perceived value of their insurance claims.

27.    Many of the bills and records at issue in this Complaint were mailed and faxed directly to Allstate by the defendants in order to induce payment of first-party medical benefits pursuant to the Florida Motor Vehicle No-Fault Law, Fla. Stat. § 627.730, *et seq*.

28. Other times, the defendants' bills were presented to Allstate for the first time by the defendants' law firm associates as part of demands seeking all or nearly all of the limits of coverage provided by Allstate's insurance policies.

29. University Orthopedic frequently communicated with patients' lawyers and law firms, and kept spreadsheets, discussed *infra*, documenting the status of patient care and litigation.

30. Because the defendants' bills and records were intended to appear valid on their face, and because Allstate and its insureds could face substantial liability for rejecting a valid demand, the defendants and their associates knew that they would induce Allstate to make substantial payments without the opportunity to conduct meaningful investigation to discover the fraud discussed herein.

31. The defendants' fraudulent bills and records were designed to be, and in fact were, a substantial factor inducing Allstate to make payments that it would not have but for the fraudulent bills by the defendants.

32. The defendants were at all times aware that the attorneys for their patients to whom the defendants sent their bills and records would in turn mail and fax them to Allstate to demand insurance payments, and that proceeds of such insurance payments would be mailed to their patients' attorneys and disbursed for the financial benefit of the defendants.

7

33.    Absent the fraudulent bills from the defendants and their associates, the bills transmitted to Allstate would have documented minimal treatment and medical expenses that totaled far less than policy limits.

34.    The defendants expected and did arrange to be compensated by their attorney associates at rates that were far less than the amounts represented to be their charged amounts in the records and bills mailed and faxed to Allstate.

35.    In addition to being fraudulent for the reasons discussed herein, all of the bills submitted by University Orthopedic were unlawful for violating several Florida laws, including laws requiring registration to perform office surgical procedures, laws requiring supervision of medical clinics by medical doctors, and laws limiting the scope of medical work that can be delegated to mid-level and unlicensed practitioners and staff.

36.    Thus, all of the bills submitted to Allstate by University Orthopedic were noncompensable independent of the fact that they were for services that were not rendered, were fabricated, were medically unnecessary, and were fraudulently billed, all of which practices of the defendants are detailed below.

37.    The defendants transmitted bills and associated records for their purported services to Allstate directly and to their attorney associates, whom the defendants knew would send them to Allstate through the U.S. Mail and via interstate wire.

8

38.     The defendants were aware that Allstate would rely, and Allstate did in fact rely, on these fraudulent bills and records in adjusting and paying insurance claims.

## V.    BILLING FOR SERVICES NOT RENDERED

39.     The defendants regularly billed for services, treatment, and testing that were never rendered to the patients at issue herein.

40.     Many of the bills generated by the defendants for services not performed were the result of their standard practices that were repeated for numerous patients.

### A.    SURGICAL PROCEDURES NOT PERFORMED

41.     As detailed further below, the defendants routinely used esoteric billing codes to double bill for components of surgical procedures in violation of numerous billing guidelines and directives applicable to the insurance claims and codes submitted.

42.     In many instances, these improper practices also resulted in bills for services that were not performed at all.

43.     For example, University Orthopedic routinely billed Allstate for procedures characterized as laser discectomies using Current Procedural

Terminology ("CPT")[1] code 63056, which describes a transpedicular or costovertebral open incision surgical approach.

44.     These procedures did not involve open incisions at all but rather were percutaneous and needle-based procedures, if any procedures were performed at all.

45.     As one representative example, on February 20, 2024, University Orthopedic billed for an alleged open incision spine surgery to S.R. (Claim No. 0738262724)[2] that was actually a needle-based procedure supposedly using a laser to excise disc material from the lumbar spine.

46.     No incision was made to S.R., there was not direct visualization of the spine, and there was no surgical approach that justified billing for an open incision procedure, yet University Orthopedic billed Allstate for code 63056.

47.     Another example of a standard practice that resulted in billing for services not rendered is University Orthopedic's billing for alleged shoulder

---

[1] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers who are subject to the Health Insurance Portability and Accountability Act ("HIPAA") are required to use CPT codes.

[2] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.  The defendants are aware of the Allstate claim number, as the defendants included the claim number on the bills they submitted to Allstate.

arthroscopy procedures that frequently included a charge for extensive debridement using CPT code 29823.

48. Extensive debridement only occurs when the procedure involves debriding three (3) discrete structures in the shoulder and a separate billing code (that is reimbursed at a lower rate) exists for limited debridement of a single area.

49. The defendants improperly billed for extensive debridement when fewer than three (3) areas of the shoulder were debrided.

50. As one representative instance of this type of common billing for a service not performed, on February 9, 2023, University Orthopedic billed for extensive debridement of E.M.'s (Claim No. 0690723127) shoulder despite debriding at most just the patient's labrum independent of separate charges for other claimed procedures.

51. That University Orthopedic did not perform extensive debridement of E.M.'s shoulder is also confirmed by the fact that the surgery center at which the procedure was claimed to be done, which is also required to bill using CPT codes that describe the procedure actually performed, billed for limited debridement only.

**B.** **INJECTIONS AND PROCEDURES NOT PERFORMED**

52. University Orthopedic billed a multitude of charges for claimed injections that were not performed at all (and, as discussed below, would be considered fraudulent double billing even if they were done).

53. As a matter of routine practice, University Orthopedic added charges for alleged performance of x-rays, pulse oximetry testing, surgical trays, needles, and application of ice packs, among other improperly double- and triple-billed charges and in addition to the charge for the procedure itself.

54. In some cases, University Orthopedic also added inexplicable transportation charges to these injection procedures.

55. In nearly every case, there is no indication that most or all of these additional charges were actually performed.

56. For example, on February 26, 2024, University Orthopedic billed for alleged lumbar medial branch block ("MBB") injections to M.C. (Claim No. 0737769885) and improperly added charges for a spinal x-ray, pulse oximetry testing, a surgical tray, needles, and transportation.

57. University Orthopedic did not document performance of an x-ray, pulse oximetry testing, or transportation, and there was no difference between the supposed surgical tray and needles charges (both of which were fraudulently billed in any event).

58. Similarly, on November 10, 2022, University Orthopedic billed for alleged injections to T.C. (Claim No. 0680028370) and also charged for x-rays, transportation, and pulse oximetry testing, none of which were actually documented as having been performed.

12

59.    University Orthopedic also submitted an additional charge for the application of ice packs, apparently for suggesting that T.C. apply ice herself at home, which is clearly not a billable service.

60.    University Orthopedic also submitted an additional charge for the alleged services of an assistant surgeon during these routine injections to T.C.

61.    Routine injections that are performed within a matter of minutes in an office do not require the services of an assistant surgeon and, apart from University Orthopedic including the name of a physician assistant on the procedure report, there is no evidence that an assistant surgeon performed any billable service at all with respect to T.C.

62.    These types of charges were inappropriately added for nearly all of the hundreds of claimed injection procedures at issue herein.

### C.    EVALUATIONS AND TESTING NOT PERFORMED

63.    University Orthopedic routinely billed hundreds of dollars for batteries of "tests" that had no clinical utility and no bearing on treatment plans or services.

64.    Many of these purported "tests" amounted to nothing more than having patients allegedly fill out questionnaires that reported their pain levels and the impact of their claimed injuries on activities of daily living.

13

65. University Orthopedic then billed a second charge, at a rate of more than $1,000 each time, for physicians supposedly interpreting the results of these questionnaires.

66. The type of information addressed by these questionnaires is the same type that a provider is expected to obtain from patients through normal evaluations that include review of patients' claimed injuries and conditions.

67. One of the "tests" routinely billed by University Orthopedic involved the use of an online program designed to evaluate concussion symptoms created by a company called Cambridge Brain Sciences, Inc. d/b/a Creyos ("Creyos").

68. Patients of University Orthopedic supposedly used this online program without any clinical supervision, as evidenced by the fact that University Orthopedic billed for its alleged use on dates that patients were not present at the clinic and even on dates prior to a patient presenting for an initial evaluation at the clinic.

69. For example, University Orthopedic billed for D.W. (Claim No. 0737140731) allegedly using the Creyos program on December 20, 2023, but did not bill for an initial evaluation of D.W. until the following day, December 21, 2023.

70. University Orthopedic billed for this purported service using CPT code 96138, which has a time component and can only be billed in thirty (30) minute units, and which requires supervision by a technician.

71.    University Orthopedic did not meet either the time component or the supervision component to bill for this service, as D.W. was simply instructed to use the Creyos program prior to presenting at University Orthopedic.

72.    University Orthopedic also billed for seven (7) units of CPT code 96127 on the day before D.W.'s initial evaluation, apparently for her filling out a series of pre-printed questionnaires.

73.    These questionnaire charges relative to D.W. (and other patients) also amount to billing for services not rendered because to be a billable service it is required that the results of the questionnaires be scored by a physician.

74.    These questionnaires purport to contain physician signatures, but a review of such signatures confirms that they are pre-signed and copied-and-pasted onto the forms and do not reflect any actual review of the results.

75.    When D.W. presented at the clinic on December 21, 2023, University Orthopedic also billed a separate charge for purportedly reviewing the results of these questionnaires, in addition to billing for the highest possible level of evaluation, for a total charge amount of more than $2,500.

76.    These charges by University Orthopedic for interpreting questionnaires also amount to billing for services not rendered because the service billed – using CPT code 96132 – requires an hour of interaction between the patient and the physician that was not provided.

77.     University Orthopedic also billed for purported evaluations that did not occur at all.

78.     As part of its predetermined protocol, University Orthopedic billed for dispensing a litany of unnecessary DME before procedures, which patients were directed to pick up at University Orthopedic's offices.

79.     University Orthopedic billed for high-level patient encounters and evaluations that require thorough medical histories, examinations, and decision-making, when nothing was done except handing the patient predetermined items of DME.

80.     For example, on December 2, 2022, University Orthopedic billed for a level three (3) evaluation of T.C. (Claim No. 0680028370), which is the third most complex level of evaluation possible to bill, even though T.C. had only presented to the clinic (if at all) to pick up an ice machine and spirometer that were supposedly necessary following a radiofrequency ablation ("RFA") procedure that was scheduled for December 6, 2022 (to take place at an ambulatory surgery center, which is apparently why the DME could not be given to T.C. on the date of the actual procedure).

81.     No services that constitute a patient evaluation, much less a moderately complex patient evaluation, were rendered to T.C. on December 2, 2022.

16

82. University Orthopedic also repeatedly billed Allstate – at a rate of $700 each time – for producing documents it called "Comprehensive Orthopedic Narrative[s]" that were apparently generated to support auto insurance claims.

83. These documents were nothing more than summaries of treatment with unsupported and inappropriate (as detailed further below) claims about costs of potential future treatments that patients were not actually considering.

84. To induce payment for these non-billable reports, University Orthopedic claimed they were "[w]ork related or medical disability examination[s]" by using CPT code 99455.

85. In order for such a service to be billable, it must include completion of medical history, performance of examination commensurate with the patient's condition, formulation of diagnoses, assessment of capabilities and stability, and development of a future treatment plan.

86. The defendants' summary reports did none of these, as they merely reviewed prior records and speculated about potential future costs without actually developing a future treatment plan.

87. For example, on August 24, 2023, University Orthopedic billed Allstate $700 using CPT code 99455 for preparing a "Comprehensive Orthopedic Narrative" relative to M.G. (Claim No. 0635464688).

88.     At that point, M.G. had not actually been seen at the clinic in over a month.

89.     The report did not meet any of the requirements for CPT code 99455 and was merely used as an attempt to inflate the insurance claim by speculating about future treatment.

## VI.    ILLEGAL KICKBACK ARRANGEMENTS

90.     As detailed below, University Orthopedic often arranged to use ambulatory surgery centers ("ASCs") for routine pain management procedures that could and should have been done in its own offices.

91.     Ambulatory surgery centers were used for these routine procedures because doing so allowed the ASCs to generate separate facility fee charges that multiplied the total amount billed to Allstate and increased significantly the perceived value of insurance claims.

92.     University Orthopedic also used ASCs for such procedures because its owners entered into illegal and fraudulent kickback arrangements with ASCs whereby University Orthopedic's owners profited from the facility fee charges (in addition to University Orthopedic's own professional fee charges).

93.     Florida law provides, in relevant part, that "[i]t is unlawful for any health care provider or any provider of health care services to offer, pay, solicit, or

receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients."  Fla. Stat. § 456.054(2).

94.    When University Orthopedic arranged to perform procedures in ASCs, it also arranged, through separate entities with shared ownership, to purchase the right to collect the facility fees generated by the ASCs for a small fraction, often less than 10%, of the amount charged to Allstate as the facility fee.

95.    Despite this enormous discount, the full amount of the facility fee charge generated by the ASC was invariably submitted to Allstate with demand for payment in full.

96.    One of the entities used for this purpose is called ASC Lender, LLC ("ASC Lender"), which is owned in part by Dale Hersey ("Hersey"), who has a financial interest in University Orthopedic, and Phillip Ray ("Ray"), who is the CFO of University Orthopedic.  ASC Lender was formerly owned in part by defendant Estra.

97.    That University Orthopedic coordinated with ASC Lender for these purchases and reimbursements is also confirmed by numerous email exchanges in which Estra, Hersey, and Ray jointly reviewed and approved disbursements of insurance proceeds between the entities.

98.    Hersey is also an owner and manager and Ray the vice president of Tidewater Capital Group, Inc., which is also an investor in University Orthopedic.

19

99.    When the owners of University Orthopedic obtained potential 1,000% returns on their purchase of the right to collect facility fees from ASCs at which University Orthopedic arranged to perform procedures, it amounted to a kickback with the intention to induce referrals, unnecessary medical treatment, and unnecessary use of ASCs.

100.    As one representative example, on December 6, 2022, University Orthopedic arranged for an RFA procedure to be administered to T.C. (Claim No. 0680023870) at an ASC.

101.    In addition to the charge for professional services billed by University Orthopedic, the ASC billed an additional $16,500 to Allstate as a facility fee for the alleged procedure.

102.    Rather than seek to recover that facility fee for itself, the ASC sold the right to recover the $16,500 to ASC Lender – again, a related entity with shared ownership with University Orthopedic – for just $1,500.

103.    Similarly, on December 14, 2022, University Orthopedic arranged for an RFA to G.C. (Claim No. 0682191838) to be performed in an ASC.

104.    As with T.C., the ASC billed $16,500 as a facility fee and immediately sold the right to collect that facility fee back to ASC Lender for just $1,500.

105.    An RFA is a procedure that can and routinely is safely performed in an office setting.

20

106. The kickback arrangement between University Orthopedic and the ASCs was designed to induce the procedures to be performed in such facilities rather than in office to multiply the amounts billed to Allstate.

107. University Orthopedic, ASC Lender, and the ASCs with which they contracted also entered into these arrangements with regard to claimed surgical procedures.

108. For example, on March 9, 2023, University Orthopedic arranged for C.O. (Claim No. 0682637566) to undergo a shoulder surgery in an ASC.

109. In addition to the professional charges submitted by University Orthopedic, the ASC billed an additional $65,020 as a facility fee.

110. The ASC then sold the right to collect this $65,020 back to ASC Lender as part of a bulk transfer of bills for several patients, which allowed the defendants to seek to recover more than twice the amount of their professional fees without performing any additional service and served to induce the performance of surgeries for patients who may otherwise have been adequately treated with conservative measures.

111. University Orthopedic also paid illegal kickbacks to its own physicians to facilitate the unnecessary use of ASCs for routine pain management procedures.

112. In correspondence sent by defendant Estra to a physician he was attempting to recruit to University Orthopedic, it was conveyed that University

21

Orthopedic would pay bonuses of $1,000 for RFAs performed in surgery centers and just $250 for RFAs performed in office.

113. While it is inappropriate to induce physicians to perform treatments through bonus structures like this at all, the fact that University Orthopedic paid four (4) times more for procedures done in ASCs is further evidence of the profitability of the defendants' illegal kickback arrangements with the ASCs.

114. Similarly, University Orthopedic offered to pay the physician bonuses of $250 for injections done in surgery centers but no bonus at all for injections done in office.

115. Again, this arrangement was intended to and did in fact result in inducing physicians to unnecessarily schedule routine procedures to take place at surgery centers so that the defendants could multiply their profits through kickback agreements.

## VII.   UNLICENSED AND UNLAWFUL SERVICES

### A.   UNLAWFUL LACK OF SUPERVISION

116. University Orthopedic has thirteen (13) clinic locations throughout Florida, all of which provide healthcare services and tender charges for reimbursement for these services to insurance companies like Allstate.

117. Florida's Health Care Clinic Act (the "Clinic Act"), Fla. Stat. §§ 400.990, *et seq.*, requires that any clinic owned by laypersons must have a license from the Florida Agency for Health Care Administration ("AHCA").

118. The Clinic Act also requires that any licensed clinic must appoint a medical director who agrees to accept legal responsibility for certain activities of the clinic. Fla. Stat. § 400.9935(1).

119. One of the medical director's responsibilities is to conduct "systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." Fla. Stat. § 400.9935(1)(g).

120. The Clinic Act states that "a charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part… is an unlawful charge, and is noncompensable and unenforceable." Fla. Stat. § 400.9935(3).

121. Under Florida law, "[a]n insurer or insured is not required to pay a claim or charges . . . For any service or treatment that was not lawful at the time rendered[.]" Fla. Stat. § 627.736(5)(b)(1)(a).

122. The AHCA's regulations clarify the scope of medical directors' responsibilities under the Clinic Act in regulations, stating "[a] licensed health care clinic may not operate or be maintained without the *day-to-day supervision* of a single medical or clinic director as defined in Section 400.9905(5), F.S. The health

23

care clinic responsibilities under Sections 400.9935(1)(a)-(i), F.S., cannot be met without an active, appointed medical or clinic director." Fla. Admin. Code R. 59A-33.008(1) (emphasis added).

123. These responsibilities include but are not limited to certification of licensure for the level of care provided, review of patient referral contracts, maintaining compliance with statutory recordkeeping requirements, and regular systematic review of clinic billings to ensure bills are lawful.

124. Under Florida law, medical directors are required to "[c]onduct systematic reviews of clinic billings to ensure that billings are not fraudulent or unlawful." *See* Fla. Stat. § 400.9935(g). If a medical director discovers an unlawful charge, the medical director or clinic director is required to "take immediate corrective action." Id.

125. Despite the millions of dollars of clearly unlawful and improper charges described herein, not once during the relevant period at issue did any University Orthopedic medical director contact Allstate to inform Allstate of an improper charge.

126. When a medical director fails to conduct sufficient reviews of billing to ensure bills are not fraudulent or unlawful, that clinic is operating in violation of the Clinic Act.

24

127. That the physicians claimed to be medical directors by University Orthopedic did not fulfill their statutory and regulatory duties is confirmed by reports made by University Orthopedic physicians and individuals who were formerly named to medical director roles.

128. One former medical director of University Orthopedic (at its Hollywood location) explained to Allstate that he received an email from University Orthopedic asking him to sign a form stating that he was the medical director despite the fact that he was not trained and "performed zero work in the role."

129. Not only did this physician clearly not take the active role in day-to-day supervision that was required, he also reported numerous improper and unlawful practices to the owners and managers of University Orthopedic that were not addressed, as detailed further below.

130. Another former physician stated to Allstate that after being appointed medical director at two (2) University Orthopedic clinic locations, staff would provide him with ten (10) to twenty (20) patient files a month to review and that he would record his findings in a notebook.

131. Estra has testified that University Orthopedic sees approximately 2,000 new patients a month across its network of thirteen (13) locations, and many of these patients return for long courses of treatment, as detailed below.

132.   A nurse practitioner at University Orthopedic testified that he alone sees "20 to 30 different patients a day."

133.   Performing at best cursory reviews of such a small percentage of patient records generated by University Orthopedic in a month does not come close to meeting the actual statutory requirements for medical director supervision.

134.   The United States Court of Appeals for the Eleventh Circuit has held that the following conduct fails to comply with the Clinic Act:

> All three clinics appointed the same medical director . . .. In her capacity as a medical director, Dr. Vizcay was responsible for, among other things, systematically reviewing clinic billings to ensure that they were not fraudulent or unlawful. Despite that obligation, she apparently reviewed a total of only five files per month from each clinic. The record does not say exactly how many files each clinic had, but at oral argument the attorney for the clinics conceded that it was over 100.

Allstate Insurance Company, *et al.* v. Sara C. Vizcay, M.D., *et al.*, No. 14-13947 (11th Cir. 2016).

135.   The conduct of the purported medical directors of University Orthopedic falls far below even that of Dr. Vizcay cited above.

136.   Defendant Rigueras was also an absentee medical director who failed to provide day-to-day supervision of University Orthopedic operations and failed to conduct systematic reviews of clinic billing as required by Florida law.

137. Indeed, in 2019, the University Orthopedic location in Port St. Lucie was cited by AHCA for, *inter alia*, failing to have its medical director conduct chart reviews at which time defendant Rigueras was the supposed medical director.

138. Rigueras's disregard for his duties as medical director continued thereafter as one former physician who worked at a location in which Rigueras was allegedly the medical director reported to Allstate that he "rarely ever saw Dr. Rigueras" and the last year he worked for the group he "did not see Dr. Rigueras at all."

### B.    UNLAWFUL OFFICE SURGERIES

139. That University Orthopedic's medical directors failed to provide even basic oversight and supervision as required by Florida law is also confirmed by the practice's blatant violations of other laws.

140. For example, University Orthopedic did not obtain office surgery registration until March 18, 2025.

141. An office surgery registration must be obtained from the Department of Health if a physician performs Level II or Level III office surgeries. *See* Fla. Stat. § 458.328(1)(a)1.

142. A Level II office surgery includes "any surgery in which the patient's level of sedation is that of moderate sedation and analgesia or conscious sedation." Fla. Admin. Code R. 64B8-9.009(4)(a)(2) (2024).

143.   "Moderate sedation and analgesia or conscious sedation is a drug-induced depression of consciousness during which patients respond purposefully to verbal commands, either alone or accompanied by light tactile stimulation." Id.

144.   A Level III office surgery is one "in which the patient's level of sedation is that of deep sedation and analgesia or general anesthesia."  Fla. Admin. Code R. 64B8-9.009(6)(a)(1).

145.   "Deep sedation and analgesia is a drug-induced depression of consciousness during which patients cannot be easily aroused but respond purposefully following repeated or painful stimulation." Id.

146.   University Orthopedic routinely claimed to administer sedation to patients for procedures allegedly done in its offices prior to March 18, 2025, including procedures such as injections and RFAs that were a typical component of University Orthopedic's excessive and unnecessary treatment protocol as detailed below.

147.   The bills submitted by University Orthopedic for Level II and Level III office surgery procedures prior to March 18, 2025 are fraudulent and unlawful as University Orthopedic did not have office surgery registration until that date.

### C.    UNLAWFUL SERVICES BY "EXTENDERS"

148.   Many of the services billed by University Orthopedic were performed, if at all, by assistants and mid-level practitioners who were referred to as "extenders."

149.   While it is permissible for physicians to delegate certain duties to mid-level practitioners such as physician assistants and registered nurses, such delegation must be within the authorized scope of practice of such mid-level practitioners and must be adequately supervised.

150.   Several former physicians of University Orthopedic have expressed concerns that extenders were performing services and procedures that exceeded their training and capabilities.

151.   For example, one former physician reported that he observed a nurse named Franklin Scovino performing pain management injections without adequate supervision in February 2023, which was before this mid-level practitioner obtained an advanced practice registered nurse license in April 2023.

152.   This physician also disclosed that he reported his concerns to ownership and management of University Orthopedic but nothing was done in response.

153.   University Orthopedic also misrepresented to patients the qualifications of extenders and often referred to them as "doctors" in order to create confusion about who actually performed and supervised treatments.

154. Many of the services at issue in this Complaint were claimed to be done or supervised by defendant Rigueras.

155. It is simply not possible that Rigueras actually performed and supervised all of the treatments claimed to be his responsibility (in addition to carrying out his duties as medical director at five (5) University Orthopedic locations).

156. One patient, E.M. (Claim No. 0789720363), was shown the picture of Rigueras used on the University Orthopedic website but did not recognize him as the person who had rendered his treatment.

157. However, on the bills and records submitted by University Orthopedic to Allstate, it was represented that Rigueras performed the services to E.M.

D.    UNLAWFUL SERVICES BY PHYSICIANS

158. In another example of routine unlawful services billed by University Orthopedic, at least one of its physicians, Harold Lawler, M.D. ("Lawler"), is permanently restricted by the Florida Board of Medicine from working "in a pain management clinic as defined in Section 458.3265, Florida Statutes." *See* DOH Case No. 2016-19519, Final Order dated December 18, 2018.

159.  A "[p]ain-management clinic" is defined as "any publicly or privately owned facility . . . [t]hat advertises in any medium for *any type of pain-management services*[.]"  Fla. Stat. § 458.3265 (emphasis added).[3]

160.  University Orthopedic advertises itself as providing pain management services and, therefore, Lawler's employment at the clinic was not and is not lawful.

161.  In documents filed with AHCA dated May 18, 2021, University Orthopedic described its business as a "Company [that] performs pain management and surgical procedures."

162.  University Orthopedic also advertises its pain management services on its website, as seen here in screenshots from its website:



---

[3] Florida Statutes § 458.3265 separately contains a registration scheme for pain-management clinics with exemptions that are not applicable to the definition of "pain-management clinic" referenced by Lawler's disciplinary order.



163. Further, University Orthopedic routinely submitted bills to Allstate for pain management services allegedly provided by Lawler.

164. As just one representative example, Lawler allegedly saw patient N.P. (Claim No. 0761310788) on August 13, 2024 and recommended "[i]nterventional [p]ain [p]rocedure[s]" such as facet injections and prescribed and filled in house an anti-inflammatory medication prescription and a muscle relaxer.

165. Thus, none of the services allegedly rendered by Lawler (billed by University Orthopedic) to the patients at issue herein were ever lawful or compensable.

## VIII.  FALSIFIED AND FABRICATED RECORDS

166. The defendants submitted altered, forged, and fabricated medical records to create the appearance of significant injury in order to support their charges submitted to Allstate for unnecessary services.

32

167. As detailed below, the defendants' predetermined treatment protocol called for extremely aggressive recommendations for invasive procedures and surgeries, so it is no surprise that records were altered and falsified to support this practice.

168. In many cases, documents purporting to support treatment performed by a physician were clearly not actually signed by that physician despite purporting to be.

169. For example, documents allegedly signed by Rigueras and purporting to document treatment performed by him contain several different signatures, as illustrated below:



170. Similarly, the same signature purported to be that of Rigueras, Lawler, another physician named Carmen Ramirez, M.D., and a nurse practitioner named Ramon Pinto-Fuentes were used on the bills submitted to Allstate by University Orthopedic, as illustrated below:

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN |
|---|---|
| 82-2151133 | ☐ ☐ |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER
INCLUDING DEGREES OR CREDENTIALS
(I certify that the statements on the reverse
apply to this bill and are made a part thereof.)
HAROLD JOSEPH LAWLER III

2/26/2024

SIGNED        DATE

NUCC Instruction Manual available at: www.r

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN |
|---|---|
| 82-2151133 | ☐ ☐ |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER
INCLUDING DEGREES OR CREDENTIALS
(I certify that the statements on the reverse
apply to this bill and are made a part thereof.)
CARMEN TERESA RAMIREZ

4/13/2023

SIGNED        DATE

NUCC Instruction Manual available at: www.r

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN |
|---|---|
| 82-2151133 | ☐ ☐ |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER
INCLUDING DEGREES OR CREDENTIALS
(I certify that the statements on the reverse
apply to this bill and are made a part thereof.)
ANGEL J RIGUERAS

11/16/2022

SIGNED        DATE

NUCC Instruction Manual available at: www.

171. University Orthopedic also had its physicians pre-sign forms about patient treatment and billing, confirming that no patient-specific assessment was done and that University Orthopedic operated pursuant to a predetermined protocol.

172. For example, University Orthopedic had patients and its physicians sign the same form that "certified" that the University Orthopedic physician had "explained to the [patient] sufficiently for that [patient] to sign this form with informed consent" and purports to confirm that University Orthopedic's "accompanying statement or bill" is "complete[]" and that all "coding of procedures on the accompanying statement or bill is proper" and not "upcoded, unbundled, or" otherwise unlawful.

173. However, these "certification" forms were pre-signed by the University Orthopedic physician and were not tied to specific patients.

174. For example, Liam Fitzpatrick ("Fitzpatrick"), a former physician at University Orthopedic, signed this allegedly patient-specific informed consent form in 2022 as to patient C.M. (Claim No. 0726589988) even though C.M. was not seen at University Orthopedic until 2024 (almost a year and a half after Fitzpatrick signed the form):

The undersigned insured person (or guardian of such person) affirms:

1. The services or treatment set forth below were **actually rendered.** This means that those services have **already been provided.**

   _____

2. I have the right and the **duty to confirm** that the services have already been provided.

3. I was **not solicited** by any person to seek any services from the medical provider of the services described above.

4. The medical provider has **explained** the services to me for which payment is being claimed.

5. If I notify the insurer in writing of a billing error, I may be entitled to a portion of any reduction in the amounts paid by my motor vehicle insurer. If entitled, my share would be at least 20% of the amount of the reduction, up to $500.

| Name (PRINT or TYPE) | Signature | Date 2/1/24 |

The undersigned licensed medical professional or medical director, if applicable, affirms the statement numbered 1 above and also:

A. I have **not solicited** or caused the insured person, who was involved in a motor vehicle accident, to be solicited to make a claim for Personal Injury Protection benefits.

B. The treatment or services rendered were explained to the insured person, or his or her guardian, **sufficiently** for that person to sign this form with informed consent.

C. The accompanying statement or bill is **properly completed** in all material provisions and all relevant information has been provided therein. This means that each request for information has been responded to **truthfully, accurately,** and in a **substantially complete** manner.

D. The coding of procedures on the accompanying statement or bill is proper. This means that no **service has been upcoded,** unbundled, or constitutes an invalid or **not medically necessary diagnostic test** as defined by Section 627.732 (15) and (16), Florida Statutes or Section 627.736(5)(b)6, Florida Statutes.

Licensed Medical Professional Rendering Treatment/Services or Medical Director, if applicable (Signature by his/ her own hand):

| LIAM FITZPATRICK | Signature | Date 10/19/22 |
| Name (PRINT or TYPE) | | |

175. When pressed to explain why he pre-signed this form, Fitzpatrick testified that "it may have been a form I signed kind of in the beginning that they [University Orthopedic] used moving forward."

176. Thus, it is clear by the testimony of its own physicians that University Orthopedic fabricated records and forms, including having physicians make "certifications" more than a year before they even saw patients.

177. University Orthopedic also included completely irrelevant purported evaluation findings in its records to make it appear that alleged evaluations were more complex than they actually were.

178. University Orthopedic falsified patient diagnoses to create the appearance that injections and procedures for which it billed were medically proper.

179. That these diagnoses were falsified is evidenced by the fact that they were purportedly supported by orthopedic examinations that could not actually be performed during the telehealth visits University Orthopedic often claimed to perform.

180. For example, on September 26, 2022, University Orthopedic billed for an alleged telehealth evaluation of G.C. (Claim No. 0682191838) and claimed that G.C. had pain during a straight leg raise at 90 degrees.

181. A straight leg raise is a test wherein the patient lies on their back and their legs are raised by the physician.

182. It is not possible that the patient could have self-performed a straight leg raise to elicit the information that University Orthopedic claimed.

183. University Orthopedic also exaggerated and fabricated patients' reported pain scores in limitations in order to create the appearance that ongoing treatment was appropriate.

184. For example, C.O. (Claim No. 0682637566) underwent a course of chiropractic treatment with an unrelated provider after an alleged motor vehicle accident on August 15, 2022.

185.    The chiropractor meticulously recorded C.O.'s pain scores at each appointment and while his pain started at 8/10 in his neck and 10/10 in his lumbar spine, by the end of October 2022, C.O.'s pain had decreased to just 2/10 in his neck and 5/10 in his lumbar spine.

186.    Despite this clear evidence of a successful course of conservative care and low pain scores, when University Orthopedic billed for an initial evaluation of C.O. on October 25, 2022, it falsely claimed that he was experiencing 7/10 pain in both areas of his spine to create the appearance of necessity for the excessive treatment that it immediately recommended.

187.    All of the types of fabricated, exaggerated, and falsified records addressed herein were intended to create the appearance of severity of injury and necessity of treatment and were intentionally used by the defendants and their associates to induce Allstate to make payment for alleged treatments that were not performed, were unlawful, were excessive, were medically unnecessary, and which were never intended to be performed at all, and Allstate is entitled to a return of all money paid as a result of such fabricated records.

## IX.    IMPROPER REFERRALS AND MANIPULATION OF CLAIMS

188.    Many patients were referred directly to University Orthopedic by their (the patients') attorneys.

37

189. The defendants' relationships with their attorney referral sources directly and intentionally led to the bills for medically unnecessary and excessive services detailed below.

190. The referral of alleged accident victims to University Orthopedic bore no relation to the medical necessity of evaluation or treatment of the patients at issue in this Complaint, who would not have sought treatment but for the improper referrals.

191. Attorneys referred their clients to University Orthopedic because they knew that the defendants would produce artificially high medical bills that could be used to extract high payments from Allstate and in turn higher contingency fees for the attorneys.

192. The defendants provided fraudulent bills to their attorney referral sources in order to obtain patients, and to collect a portion of the insurance proceeds that later were obtained.

193. Treatment that is used to generate bills to inflate the value of insurance claims is fraudulent and noncompensable, and Allstate is entitled to restitution for all amounts it was induced to pay by the submission of such bills.

194. Not only did the defendants generate excessive charges for unnecessary treatment, they also improperly allowed attorneys and other laypeople to dictate patient referrals and services.

195.   For example, in a spreadsheet compiled by University Orthopedic, the following representative entries document numerous instructions about medical care that were given by attorneys:

| |
| --- |
| Atty advised not to schedule |
| Atty advised to hold off |
| Sx DENIED |
| PROCEDURE DONE |
| Atty ok'd |
| CASE SETTLED |
| PROCEDURE DONE |
| Sx DENIED |
| PROCEDURE DONE |
| Atty ok'd for in office - Patient put it on hold |
| PROCEDURE DONE |
| Atty advised to hold off |
| Atty advised to hold off |
| Emailed cost letter to case manager 06/07/21, 06/21 |
| Emailed cost letter to case manager 06/08, 06/21 |
| Emailed cost letter to case manager 06/11, 06/21 |
| PROCEDURE DONE |

196.   Another excerpt of University Orthopedic's spreadsheet documents it seeking and taking instructions from both attorneys and "marketers" about patient care:

| |
| --- |
| Not enough covarage 8/29 for sx |
| Emailed cost letter 7/25, lvm 8/23, sent to marketer 9/7 emailed again 10/24, Lvm for attny 11/04, Lvm 11/15 |
| CASE SETTLED |
| Emailed cost letter 8/8, called 8/23, sent to marketer 9/7, Lvm 11/15, Px approved 11/15 pt does not wish to mo |
| Sx approved 9/27 |
| PROCEDURE DONE |
| Emailed cost letter 8/11, pt wants to hold off |
| DENIED 8/16 |
| Sx approved 8/29, Patient denies surgery 9/27 |
| Emailed cost letter 8/9, Hold off 8/9, Lvm for attny 11/04. Lvm 11/15 |
| Emailed cost letter 8/16, Lvm 8/23, Called lvm 8/29, ON HOLD PER ATTY 8/30, Lvm 11/15 |
| Emailed cost letter 8/18, faeliza following up 8/23, APPROVED 9/7, pt said her atty told her to wait 9/7 |
| PROCEDURE DONE |
| Emailed cost letter 8/18, lvm 8/23, LVM 8/29, sent to marketer 9/7 |
| PROCEDURE DONE |
| Cancelled by atty office 11/28 |
| Emailed cost letter 8/23, atty will talk to pt, then call us 8/29, sent to marketer 9/7, Pt possibily having sx done el |
| SCHEDULED 2/16 |
| PROCEDURE DONE |
| Scheduled 02/16 |
| Atty will call me if approved 9/1, Lvm 11/15, LVM 12/20 |
| Emailed cost letter 9/21, low limits -Had rt knee in aug |
| PROCEDURE DONE |
| PROCEDURE DONE |
| Patient does not wish to proceed |
| PROCEDURE DONE |
| Sx approved 9/16 - Patient not ready to schedule, will call once he is 9/23, Lvm 10/17 Procedure on hold per Nico |
| Trying to go through health insurance |
| On Hold 9/16, Lvm for attny 11/04 |

39

197. Another way in which the defendants intentionally and improperly manipulated the perceived value of insurance claims was by claiming that patients would need incredibly expensive procedures following the conclusion of their treatment despite there being no evidence whatsoever that such treatment would be medically necessary or that the patients had any intention of obtaining that treatment.

198. As one example, on February 13, 2024, University Orthopedic generated a letter as to J.N. (Claim No. 0735657942) claiming that Steven Puccio, D.O. ("Puccio") had recommended a surgical procedure to J.N.'s cervical spine that would include a fusion and would cost over $200,000.

199. The next day, and without explanation for the change, University Orthopedic generated a second letter to J.N. claiming that Puccio had actually recommended a cervical epidural steroid injection ("ESI") (which it inexplicably claimed was to treat "facet joint syndrome").

200. There is no indication that J.N. intended to undergo either of these procedures but the letters generated by University Orthopedic were nevertheless used in an attempt to induce Allstate to tender its policy limits in response to a demand.

201. Similar to unsupported estimates for future treatment, University Orthopedic also included impairment rating assessments in the records submitted to Allstate purporting to document its final encounters with patients.

40

202.   That these impairment ratings were intended only for the use of the patients' attorneys in litigation and submitting demands is evidenced by the example of M.C. (Claim No. 0737769885), whose record dated February 26, 2024 stated that an impairment rating would be calculated upon request.

203.   If it was medically appropriate for an impairment rating to be done, it simply would have been done and not written as an invitation for an attorney to request it.

204.   The actions of the defendants were the proximate and direct cause of Allstate's damages as to the patients at issue herein where the defendants and attorneys used the same scheme to induce payments from Allstate, and Allstate is entitled to repayment from the defendants of the full amounts it was induced to pay due to their false and fraudulent submissions.

## X.    FRAUDULENT DOUBLE BILLING

205.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

206.   The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

41

207.   The medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

208.   Providers such as the defendants are subject to the Health Insurance Portability and Accountability Act and are thus required to use CPT codes when submitting bills.

209.   By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they utilized.

210.   The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills were intended to have any meanings other than those ascribed by the AMA and the Centers for Medicare and Medicaid Services ("CMS"), which publish CPT and HCPCS codes, respectively.

211.   Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

212.   Allstate reasonably relied on the defendants' utilization of CPT and HCPCS codes to accurately report the services they rendered.

42

### A.   DOUBLE BILLING FOR INJECTIONS

213.   The defendants routinely manipulated CPT codes in contravention of the AMA's published guidance in order to bill Allstate multiple times for the same claimed procedures, which is fraudulent double billing.

214.   Double billing occurs when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same patient on the same date of service.

215.   The defendants' double billing was not simply a matter of inadvertent incorrect coding; it was a targeted method intentionally used by the defendants to induce Allstate to pay multiple times for the same purported services.

216.   As detailed above, when the defendants claimed to perform injections, they added an incredible number of additional charges, including for services not actually performed and supplies not actually used.

217.   Even when these charges were for services actually performed, the vast majority were fraudulently double billed and never payable.

218.   Among the charges that were routinely submitted by the defendants in conjunction with injections and never properly billable were alleged fluoroscopic guidance (CPT codes 77002 and 77003), application of ice packs (CPT code 97010), pulse oximetry testing (CPT code 94760), use of surgical trays (CPT code 99070 and

43

HCPCS code A4550), use of needles (HCPCS code A4212), and use of contrast dye (HCPCS code Q9966).

219.    University Orthopedic billed Allstate in excess of $970,000 during the period at issue in this Complaint for these charges in conjunction with injections that were never proper and were never payable, as documented by the table below:

| CPT Code | No. of Patients | Amount Billed |
|---|---|---|
| 77002 | 46 | $25,038 |
| 77003 | 296 | $156,541 |
| 94760 | 774 | $13,124 |
| 97010 | 1,172 | $68,342 |
| 99070 | 238 | $96,634 |
| A4212 | 1,157 | $325,232 |
| A4550 | 1,159 | $265,673 |
| Q9966 | 809 | $21,958 |
| | | **$972,317** |

220.    In many cases, the defendants triple billed these charges, as items such as needles were also included in the surgical trays that were also improperly billed.

221.    Occasionally, the defendants documented the items included in surgical trays, including with respect to injections allegedly rendered to representative example T.C. (Claim No. 0680028370) on November 10, 2022.

222.    The surgical tray billed by University Orthopedic on that date included the needles that were also additionally billed by University Orthopedic, and also included lidocaine and Marcaine that were claimed to have been used.

223.    Despite these injectate medications being included as part of the surgical tray charge, University Orthopedic also improperly billed separately and additionally for each of these substances.

224.    All instances of double and multiple billing were never compensable and Allstate is entitled to its full damages for the defendants' routine and intentional submission of such charges.

## B.    IMPROPER BILLING DURING GLOBAL PACKAGE PERIODS

225.    Billing guidelines for patients undergoing procedures such as injections establish a global "package" of components that are included in the charge amount for the procedure itself, including all services normally furnished before, during, and after a procedure.

226.    These guidelines apply in any setting, including inpatient hospitals, outpatient hospitals, ambulatory surgical centers, and physician's offices.

227.    The global package includes patient evaluations during a defined period of time before, on the day of, and after a procedure based on the type of procedure performed.

228.    Providers may not separately bill for the evaluation of a patient related to the procedure being performed if the evaluation occurs during the global period.

229.    The guidelines establish three (3) global periods that apply to different types of procedures: (a) a "zero-day" post-operative period for certain minor

procedures, such as injections, that prohibits providers from billing for a separate patient evaluation on the day of the procedure; (b) a "10-day" post-operative period for other procedures that prohibits providers from billing for a separate patient evaluation on the day of the procedure and for ten (10) days immediately following the date of the procedure; and (c) a "90-day" post-operative period for major surgeries that prohibits providers from billing for separate patient evaluations one (1) day before the procedure, on the day of the procedure, and for 90 days immediately following the date of the surgery.

230. University Orthopedic routinely billed for evaluations within these global package periods.

231. As one representative example, University Orthopedic billed for an alleged evaluation of G.C. (Claim No. 0682191838) on October 12, 2022 despite G.C. presenting to the office that date for a pre-planned injection procedure.

232. The evaluation billed by University Orthopedic was not separate from the injection; if any evaluation was done at all, it was of the type that was incident to performing the injection to G.C. and not billable.

233. University Orthopedic then billed for an alleged RFA procedure to G.C. on December 14, 2022, which has a 10-day post-procedure global period.

234. University Orthopedic nevertheless billed Allstate for a follow-up examination just seven (7) days later on December 21, 2022.

46

## XI.    UNREASONABLE    AND    UNNECESSARY    FRAUDULENT TREATMENT

235.    The defendants' willingness to bill for services not rendered and unlawfully rendered and to fabricate records demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

236.    The defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

237.    To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

238.    That the defendants use a predetermined protocol is undisputed. Indeed, a nurse practitioner at University Orthopedic testified that "we have protocol.  The protocol we recommend medications, we recommend injections . . . ." (grammatical errors original).

239.    The defendants' purported treatment violated standards of care in the medical community, as the vast majority of testing, referrals, procedures, and treatment were not medically indicated, and were redundant, excessive, and repeated without any benefit to patients.

240. The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the chart annexed hereto at Exhibit 1.

241. All of the bills submitted by the defendants seeking payment for predetermined and unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

242. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money it was induced to pay as a result of the defendants' fraud.

243. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and were not evident within the four corners of the medical records and bills submitted to Allstate.

### A.   MEDICALLY UNNECESSARY INJECTIONS

244. University Orthopedic routinely billed Allstate for injections that were medically unnecessary, if they were performed at all.

245. The performance of invasive procedures, including injections, must be based upon adequate diagnosis and legitimate medical necessity.

246. As discussed above, examinations billed by the defendants, if they were performed at all, resulted in boilerplate findings (often fabricated and exaggerated)

and predetermined treatment protocols that were not adequate to support the performance of invasive procedures.

247. The defendants also did not clearly explain to patients what injections they were recommending and performing, which prevented patients from making informed decisions about excessive treatment.

248. For example, L.T. (Claim No. 0710217449) testified with respect to injections recommended and billed by University Orthopedic: "They were very vague, they were not specific. I did not know what they were injecting."

249. Moreover, the defendants inexplicably billed for injection procedures that were inappropriate for patients' subjective complaints and objective examination findings; were improperly attempted for therapeutic purposes when they are intended to be diagnostic; and without using information gleaned from such injections for any purpose.

250. Consequently, patients received unjustified invasive procedures that offered little therapeutic or diagnostic efficacy while subjecting the patients to unnecessary risks of infection and complications.

251. ESIs are indicated when a patient complains of radicular pain (which must be confirmed through a proper neurologic evaluation and testing) and are both diagnostic and therapeutic, in that if a patient experiences a sufficient level of pain relief for an appropriate period, the injected disc space is determined to be the

possible source of the patient's pain and further treatment, including additional ESIs, may be appropriate.

252. Facet blocks and MBBs are indicated when a patient complains primarily of axial, non-radiating spinal pain and involve injecting anesthetic near medial branch nerves that feed out from facet joints and are intended to be diagnostic, in that if a patient experiences a sufficient level of short-term pain relief for an appropriate period of time, then the facet joint is determined to be the possible source of the patient's pain, indicating the patient is a candidate for other therapeutic treatments such as an RFA.

253. The defendants regularly billed for ESIs and facet blocks that were inappropriate and contraindicated based on patients' actual complaints and the defendants' own supposed examination findings.

254. As one representative example, on February 26, 2024, University Orthopedic billed for an alleged initial evaluation of M.C. (Claim No. 0737769885) by Lawler and immediately recommended and billed on the same date for multiple lumbar MBBs.

255. These injections, which as noted above are intended to diagnose potential facetogenic pain, were billed despite University Orthopedic expressly finding that M.C. had radiating pain into his left leg and weakness in his extremities,

50

which are evidence that M.C.'s pain was discogenic and which constitute contraindications to performing MBBs.

256. The boilerplate form generated by University Orthopedic also was not consistent about why the injections were being done, initially claiming that they had a therapeutic purpose and then in the very next sentence claiming that they were intended to be diagnostic.

257. Similarly, on February 27, 2024, University Orthopedic billed for an evaluation of R.H. (Claim No. 0742596652) and made detailed findings of bilateral radiating pain into the calves.

258. Despite this clear evidence of radiculopathy, University Orthopedic immediately planned to perform multi-level lumbar MBBs and sacroiliac joint injections and billed for those injections on March 22, 2024.

259. Notably, R.H.'s chiropractor, who was in the middle of a course of treatment at the time these injections were inappropriately ordered and billed, consistently referred to R.H.'s lumbar pain as "sciatica" because of its dominant radiating component.

260. These injections were not only inappropriate based on R.H.'s presentation with radicular symptoms, they were also inappropriate because they addressed different potential pain generators in the same area at the same time.

261. When injections are performed in a shotgun manner such as this, it makes it impossible for the patient or the physician to accurately determine which injection caused relief, which destroys the diagnostic value of the injections (which is their entire purpose to begin with).

262. As another representative example, on October 21, 2022, University Orthopedic billed for an initial evaluation of T.C. (Claim No. 0680028370) allegedly performed by Rigueras, who immediately recommended that T.C. (who was just 19 years old) undergo multi-level cervical and L4-5 MBBs.

263. When T.C. returned on November 10, 2022, Puccio inexplicably noted that T.C. was there to undergo MBBs not just at L4-5 but also L5-S1 and bilateral SI joint injections and billed for those procedures that were not addressed by Rigueras's evaluation or recommendation.

264. Not only was there no support for these injections documented, there could not be support for doing them at the same time as they would not result in reliable diagnostic information about whether pain was emanating from the patient's facets or SI joints.

265. It is also inappropriate to subject patients to invasive injections when they have minimal or even moderate pain complaints, and most physicians agree that pain levels should be rated at least 6/10 on the pain scale to consider injections.

52

266. In order to generate more bills, University Orthopedic recommended injections to patients regardless of their pain levels, including to some patients with barely perceptible pain.

267. For example, on January 31, 2024, N.S. (Claim No. 0738411957) reported at her purported evaluation at University Orthopedic that her cervical pain levels were just 1-4/10, but University Orthopedic nevertheless recommended that she undergo three (3) levels of cervical MBBs.

268. Similarly, on June 16, 2022, M.G. (Claim No. 0635464688) reported to University Orthopedic and Rigueras that she had cervical pain of just 2/10 in her neck but Rigueras nevertheless recommended that she undergo two (2) levels of MBBs that were then billed by University Orthopedic.

### B. MEDICALLY UNNECESSARY PROCEDURES AND SURGERIES

269. The defendants' clear goal was to convince patients to undergo – or create the appearance that they would undergo – the most expensive treatments possible in order to drive up the perceived value of insurance claims.

270. When patients were seen at University Orthopedic as part of the defendants' predetermined protocol, they were nearly always given incredibly aggressive recommendations for procedures and surgeries that were not supported by examination findings, their actual conditions, or standards of care.

271. The defendants also pressured patients to submit to surgery or injections even when they were aware of clear evidence that the patients had previously responded to conservative measures or not even tried conservative measures.

272. As one representative example, on February 13, 2024, University Orthopedic claimed to evaluate S.R. (Claim No. 0738262724) for the first time and immediately recommended both ESIs to both her cervical and lumbar spine and also a laser discectomy procedure to her lumbar spine.

273. There was no medical basis to recommend any of these invasive procedures prior to more conservative methods, but the decision to recommend a laser discectomy without first evaluating the efficacy of the lumbar ESI was particularly unnecessary and outside the standard of care.

274. An ESI is intended to reduce inflammation around potentially compressed nerves; a discectomy goes a step further and removes the disc material potentially compressing the same nerves.

275. There is no valid reason to perform a discectomy procedure before waiting to see if the ESI led to relief and University Orthopedic's immediate recommendation for the patient to undergo both was done only to generate bills as quickly as possible.

### C.    MEDICALLY UNNECESSARY PRESCRIPTION MEDICATIONS

276.    University Orthopedic also used prescription medications as a means to generate bills to Allstate.

277.    University Orthopedic physicians routinely ordered medications that were billed to Allstate at rates that were drastically more than what local pharmacies charged for the exact same medications.

278.    University Orthopedic's prescriptions for these medications frequently had no relation to its purported evaluations and findings.

279.    University Orthopedic facilitated and encouraged these unnecessary prescriptions through its relationship with entities that provided University Orthopedic with an inventory/menu of the drugs that were used as part of University Orthopedic's regular protocol.

280.    One former physician of University Orthopedic reported to Allstate that these medications were not even prescribed by doctors but rather that medical assistants automatically dispensed the medications without direction from doctors.

281.    University Orthopedic also routinely engaged in the improper practice of polypharmacy, which is the prescription of numerous drugs at the same time rather than individually.

282. Prescribing drugs individually allows the provider to maintain the patient on the lowest number and dosage of drugs as necessary to treat their condition and allows the provider to assess which drugs are actually having an impact.

283. Improper polypharmacy of the type used by University Orthopedic makes it impossible to assess what medications are having an impact or whether they are actually necessary to treat a patient's condition.

284. It was common for University Orthopedic to prescribe four (4) different drugs to patients at their very first appointment without making any attempt to assess whether any of them would work individually.

285. As just one representative example, University Orthopedic billed for a purported evaluation of N.S. (Claim No. 0738411957) on December 20, 2023, which was just twelve (12) days after a claimed motor vehicle accident.

286. N.S., whose chief complaint was just headaches, was immediately prescribed four (4) separate medications: omeprazole, metaxalone, nortriptyline, and meloxicam, all of which were also billed by University Orthopedic.

287. University Orthopedic's improper use of polypharmacy is also exemplified by its routine prescriptions for drugs like omeprazole (which was included in the cocktail of drugs allegedly provided to N.S.), which is a treatment for heartburn and could only conceivably be related to an alleged motor vehicle accident if the patient had side effects from other medications.

288. As in the representative example of N.S., omeprazole was often included in University Orthopedic's excessive initial drug prescription protocols when University Orthopedic could not possibly have known that patients would experience side effects that would make this drug appropriate.

289. As another example, on October 21, 2022, University Orthopedic prescribed (and billed for allegedly dispensing to) T.C. (Claim No. 0680028370) tizanidine, celecoxib, and omeprazole, all at her initial appointment and without any reason to believe that T.C. would be unable to tolerate the side effects of any drugs nor any reason to believe that her pain could not be adequately controlled with just one of these drugs.

290. In other instances, University Orthopedic billed for allegedly dispensing drugs that were not addressed by a physician at all.

291. For example, on February 26, 2024, University Orthopedic billed for allegedly dispensing tizanidine and celecoxib to M.C. (Claim No. 0737769885) even though neither of these medications (nor any other medications at all) were mentioned by the physician who purportedly evaluated M.C. on that date.

292. University Orthopedic also utilized a predetermined protocol to bill for allegedly dispensing a cocktail of drugs to patients whenever University Orthopedic scheduled surgical procedures.

293.   These drugs that one former physician referred to as "surgical bundles" also included omeprazole despite having no evidence that patients would experience side effects from other medications.

294.   These drugs also included docuzan, a laxative that was also prescribed for potential side effects of pain medications that University Orthopedic had no idea whether patients would actually experience.

295.   Similarly, these drugs also included ondansetron, which is an anti-nausea medication that could not have been medically necessary unless the patient experienced side effects from the procedure that could not have been known to be medically necessary prior to the procedure being performed.

296.   As just one example, on March 7, 2023, University Orthopedic billed for allegedly dispensing omeprazole, docuzan, ondansetron, and meloxicam to C.O. (Claim No. 0682637566) despite C.O.'s surgery not being scheduled to take place until March 9, 2023 and therefore without any knowledge of how C.O. would respond to the procedure or to other medications.

297.   Automatically dispensing medications to patients prior to surgery was yet another way that University Orthopedic improperly increased its charges without medical basis.

298.   Further, a former physician of University Orthopedic reported to Allstate that patients were told these medications were free and included with

surgeries, which is not true and was a misrepresentation made to convince patients to accept these unnecessary and improper drugs.

## XII.  **HARM TO PATIENTS**

299.  The defendants' unnecessary and unlawful treatment, as detailed above, and fraudulent billing practices, also detailed above, injured Allstate in its business and property because Allstate was billed for the bogus and unlawful alleged treatment and Allstate tendered payment to the defendants that it would not have paid had the defendants provided true and accurate information about their conduct.

300.  The defendants' alleged treatment and billing practices also harmed patients, who were consumers that were subjected to unnecessary and unlawful treatment just so the defendants could inflate insurance claims submitted to Allstate for payment.

301.  Patients not being informed of the facts concerning the (lack of) lawfulness and (lack of) reasonableness of their treatment was harmful to patients, as the patients were deprived of the ability to make fully-informed decisions about their medical care and risked medical treatment that was not properly determined.

302.  The patients were also harmed by allowing their PIP benefits (which are capped at a maximum of $10,000 under Florida law) to be used up by the defendants (whose alleged treatment was unlawful and unnecessary).

## XIII. MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A. MISREPRESENTATIONS BY THE DEFENDANTS

303. To induce Allstate to promptly pay their claims that were propped up by their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed were necessary, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

304. Every time the defendants tendered bills and medical records to Allstate seeking reimbursement for alleged healthcare services, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

305. There are no less than eleven (11) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.    The defendants routinely billed for services that were not performed at all.

b.    The defendants entered into improper and unlawful kickback arrangements with ASCs and with its own physicians to induce unnecessary medical treatment and improper and unnecessary use of ASCs for the financial benefit of itself and its owners.

c.    The defendants unlawfully billed for services without proper and adequate supervision as required by law.

60

d.     The defendants unlawfully billed for procedures in its offices without the required office surgery registration.

e.     The defendants unlawfully billed for procedures claimed to be performed by physicians with licensure restrictions preventing their lawful employment at University Orthopedic.

f.     The defendants unlawfully billed for procedures by "extenders" who were not properly qualified or supervised.

g.     The defendants improperly allowed laypersons, including attorneys and "marketers," to direct and influence patient care.

h.     The defendants fabricated, falsified, forged, and otherwise exaggerated records submitted to Allstate to create the appearance of injury and inflate the perceived value of insurance claims.

i.     The defendants used an improper predetermined treatment protocol in order to bill for unnecessary injections, surgeries, medications, DME, and other treatment.

j.     The defendants billed for remarkably excessive and unnecessary courses of pain management injections and procedures that were not patient specific and were designed solely to maximize the amount of bills generated.

k.     The defendants routinely double billed for purported services and supplies.

306. As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

307. The foregoing facts – including billing for services not rendered, use of kickbacks to induce treatment, billing for unlawful treatment, falsifying records, allowing laypersons to direct and influence treatment, billing multiple times for the same purported services, and misrepresenting the necessity of treatment – were not,

61

and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

308. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and related services by the defendants unnecessary and unlawful (to the extent actually rendered at all).

309. The fact of improper and unnecessary treatment and billing is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the chart annexed at Exhibit 1.

310. Thus, each claim for payment (and accompanying medical records) mailed, emailed and faxed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful, not reasonable, and not medically necessary.

311. Through the submission of patient records, invoices, bills, and other medical documentation to Allstate via the U.S. Mail, emails, and faxes, the defendants attested to the fact, lawfulness, and medical necessity of the treatment, services, and medications for which they billed Allstate.

312. As the defendants did not render lawful and reasonably necessary medical treatment, services, and medications, and misrepresented the treatment, services, and medications purportedly performed, each bill and accompanying

documentation mailed, emailed, or faxed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.  ALLSTATE'S JUSTIFIABLE RELIANCE

313.  The documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

314.  At all relevant times, the defendants misrepresented the fact, lawfulness, and medical necessity of treatment and services allegedly provided by them to prevent Allstate from realizing that the claims submitted by and on behalf of the defendants were not compensable under Florida and federal law.

315.  These misrepresentations include submitting false medical documentation, including bills, documenting the fact, lawfulness, and necessity of medical treatment, services, and medications.

316.  In reliance on and as a result of the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

317.  Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the medical treatment, services, and medications billed.

## XIV.  MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

318.  As detailed above, the treatment and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed, if performed at all.

319.  The objective of the scheme to defraud Allstate, which occurred throughout the period set out in Exhibit 1, was to collect insurance payments under Florida law and Allstate policies of insurance, including inducing Allstate to make payments from which the defendants received a financial benefit in response to insurance claims that were propped up by the defendants' bills for medical services that were not rendered, were not necessary, were not lawfully rendered, and were fraudulently billed.

320.  This objective necessarily required the submission of bills for payment to Allstate, and the defendants did in fact tender charges for reimbursement to Allstate.

321.  The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service and sent emails and faxes over interstate wires.

322.  Documents, medical records, notes, reports, bills, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance

64

claims referenced throughout this pleading traveled through the U.S. Mail or over interstate wires.

323. All medical records and bills submitted through interstate wires by, or on behalf of the defendants, were emailed and/or faxed from the defendants in Florida to Allstate in Illinois, Texas, and Ohio.

324. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payment checks.

325. Payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills were often tendered via check mailed by Allstate using the U.S. Mail.

326. It was foreseeable to the defendants that submitting bills to their patients' attorneys would trigger mailings, emails, and faxes in furtherance of the scheme to defraud, including demands for payment mailed, emailed, and faxed to Allstate.

327. It was foreseeable to the defendants that submitting bills to Allstate, both directly and through their patients' attorneys, would trigger mailings, emails, and faxes in furtherance of the scheme, including payment of fraudulent bills via payment mailed and wired by Allstate.

328. The fraudulent medical billing scheme detailed herein generated hundreds of mailings, emails, and faxes.

329. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 2.

330. As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via interstate wires and the U.S. Mail related to each exemplar patient discussed in this Complaint and related to the patients identified in Exhibit 1.

331. It was within the ordinary course of business for University Orthopedic (by and through its owners and managers, defendants Estra and Rigueras) to submit claims for payment and demands to insurance carriers like Allstate through interstate wires and the U.S. Mail.

332. Moreover, the business of billing for medical treatment and services by the defendants is regularly conducted by fraudulently seeking payment to which each defendant is not entitled through the use of fraudulent communications sent via interstate wires and the U.S. Mail.

333. In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for the defendants.

334.    University Orthopedic, at the direction and with the knowledge of its owners and managers (including defendants Estra and Rigueras), continues to submit claims for payment to Allstate and, in some instances, continues to commence litigation against Allstate seeking to collect on unpaid claims.

335.    Thus, the defendants' commission of mail and wire fraud continues.

336.    As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that were misrepresented and not compensable, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

337.    As all of the defendants named herein agreed that they would use (and, in fact, did use) faxes and emails over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable and lawful, these defendants committed wire fraud as defined in 18 U.S.C. §1343.

338.    Allstate reasonably relied on the submissions it received from the defendants, including the representative submissions set out in Exhibit 2 annexed hereto and identified in the representative patient claims above and set out in Exhibit 1.

339.    As the defendants agreed to pursue the same criminal objective (namely, mail fraud and wire fraud), they committed a conspiracy within the

meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XV.  **DAMAGES**

340.   The wrongful conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

341.   Allstate's claim for compensatory damages includes (a) payments made by Allstate directly to University Orthopedic in reliance upon and as a result of the defendants' false representations regarding the fact, lawfulness, and necessity of the treatment for which they directly billed Allstate; and (b) payments made by Allstate to the defendants' patients (from which the defendants also received payment) that were based on the fraudulent, misrepresentation-laden bills and records from the defendants.

342.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate has been induced to pay millions of dollars to and for the benefit of the defendants.

343.   Allstate's damages seek monies paid directly to the defendants or on their behalf by Allstate, and the damages are not derivative of an injury to any other person or entity.  The patients at issue in this Complaint were used as pawns by the defendants and have been victimized and harmed by the defendants, as set out above,

including being subject to layperson-controlled unlawful, unnecessary, and excessive treatment, paying deductibles and copayments to the defendants for unlawful and unnecessary treatment, and using up their limited PIP benefits on alleged treatment billed by the defendants.  However, the actual target of the defendants' scheme — and the sole party who received fraudulent mailings, emails, and faxes as itemized in the exemplar patients above and in Exhibit 2 — is Allstate. Allstate alone paid the damages at issue herein.  Injury to Allstate was also the reasonably probable consequence of the defendants' actions, as it was in the ordinary course of the defendants' business to seek and collect insurance proceeds.

344.   The defendants' wrongful conduct discussed above caused Allstate to incur damages by paying claims that otherwise would not have been paid but for the defendants' misrepresentations and improper conduct (as set out in the preceding sections).  Allstate was the target of the defendants' conduct and bills, and Allstate's damages are directly related to and a consequence of the defendants' actions discussed herein.

345.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed, emailed, and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

69

346.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

**XVI.  <u>CAUSES OF ACTION</u>**

**<u>COUNT I</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(University Orthopedic Enterprise)**
**Against Bradford Estra and Angel Rigueras, M.D.**

347.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 346 set forth above as if fully set forth herein.

348.   University Orthopedic constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

349.   In connection with each of the claims identified in the within Complaint, defendants Estra and Rigueras ("Count I defendants") intentionally caused to be prepared and mailed, emailed, or faxed false medical documentation by or on behalf of defendant University Orthopedic, or knew that such false medical documentation would be mailed, emailed, or faxed in the ordinary course of University Orthopedic's business, or should have reasonably foreseen that the mailing, emailing, or faxing of such false medical documentation by or on behalf of defendant University Orthopedic would occur, in furtherance of the Count I defendants' scheme to defraud.

70

350. The Count I defendants knew that two (2) or more mailings, emails, or faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings, emails, and faxes identified in the chart annexed hereto at Exhibit 2.

351. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by defendant University Orthopedic, which they knew would be billed by defendant University Orthopedic, in order to collect payment from Allstate.

352. Estra owned and controlled University Orthopedic and was responsible for all actions taken by University Orthopedic and its staff.

353. Rigueras managed and controlled University Orthopedic (including as one of its purported medical directors) and was responsible for all actions undertaken by University Orthopedic and its staff in addition to the unnecessary and unlawful services claimed to be performed by Rigueras himself.

354. The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted University Orthopedic to continue billing for unlawful and medically unnecessary alleged treatment.

355. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to University Orthopedic for the benefit of the Count I defendants that would not otherwise have been paid.

356. The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

357. By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (University Orthopedic Enterprise)
### Against Bradford Estra and Angel Rigueras, M.D.

358. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 346 set forth above as if fully set forth herein.

359. Defendants Estra and Rigueras ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of University Orthopedic.

360. The Count II defendants each agreed to further, facilitate, support, and operate the University Orthopedic enterprise.

361. As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

362. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of University Orthopedic even though University Orthopedic was not eligible to collect such payments by virtue of its unlawful conduct.

363. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

364. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

365. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three (3) times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. §§ 501.201-501.213)
### Against All Defendants

366.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 346 set forth above as if fully set forth herein.

367.   Defendants University Orthopedic, Estra, and Rigueras ("Count III defendants") engaged in unfair and deceptive acts and practices in the conduct of trade and commerce in violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA") in relation to each insurance claim at issue herein.  *See* Fla. Stat. §§ 501.201-501.213.

368.   The Count III defendants' deceptive acts and practices include the acts described herein and include knowingly billing for services that were not performed, that were induced by kickbacks, that were a result of improper patient referrals, that were unlawful, that were falsely supported by falsified and fabricated records, and that were medically unnecessary, and misrepresenting the same to Allstate, all of which constitute false, incomplete, and misleading statements made while "knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim" in violation of the Florida Insurance Fraud Statute.  Fla. Stat. § 817.234(1)(a)(1).

369.   The Count III defendants' deceptive acts and practices also harmed patients, who were consumers subjected to unnecessary and unlawful treatment and who were not given truthful information to make their own healthcare decisions.

370.   Knowingly causing to be presented to any insurer a false claim for payment is expressly an unfair or deceptive act or practice pursuant to Fla. Stat. § 626.9541(1)(u).

371.   The Count III defendants' violations of Fla. Stat. § 817.234 and Fla. Stat. § 626.9541 are *per se* violations of the FDUTPA.

372.   Accordingly, the Count III defendants' conduct is *per se* unfair or deceptive under FDUTPA.  *See* Fla. Stat. § 501.204(1).

373.   The Count III defendants' above-described conduct was deceptive as it was likely to, and did in fact, mislead Allstate, while acting reasonably under the circumstances, to Allstate's detriment by misrepresenting the fact, lawfulness, and medical necessity of the charges.

374.   The Count III defendants' above-described conduct was unfair as it was contrary to public policy, unconscionable, immoral, unethical, oppressive, and unscrupulous, and produced no benefits to consumers or competition and in fact harmed the defendants' patients.

375.   As a result of the Count III defendants' deceptive and unfair practices, patients were harmed and Allstate has been injured in its business and property and

the defendants are liable to Allstate for damages and an award of attorney's fees pursuant to Fla. Stat. § 501.2105(1).

## COUNT IV
## COMMON LAW FRAUD
### Against All Defendants

376. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 346 set forth above as if fully set forth herein.

377. The scheme to defraud perpetrated by defendants University Orthopedic, Estra, and Rigueras ("Count IV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were actually and lawfully rendering medically necessary treatment and services and were entitled to collect payments from Allstate.

378. The misrepresentations of fact made by the Count IV defendants include the material misrepresentations discussed in section XIII, *supra*.

379. The Count IV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

380. The misrepresentations were intentionally made by the Count IV defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable insurance claims for payment would be submitted to Allstate.

381. The Count IV defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under federal and Florida law.

382. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and incurring expenses related to the adjustment and processing of claims submitted by and on behalf of the defendants.

383. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT V
### CIVIL CONSPIRACY
**Against All Defendants**

384. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 346 set forth above as if fully set forth herein.

385. Defendants University Orthopedic, Estra, and Rigueras ("Count V defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment to which they were not entitled because (1) the defendants did not actually render the treatment for which insurance claims were submitted, (2) the defendants did not provide reasonably necessary

medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices, all as described above.

386. The Count V defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

387. This purpose was known to all of the Count V defendants and intentionally pursued.

388. Despite knowing that the defendants were not entitled to payment because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count V defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

389. In reasonable reliance on and as a result of the false medical documentation submitted by the defendants, Allstate paid certain of the insurance claims submitted.

390. All of the Count V defendants directly benefited from the payments made to University Orthopedic.

391. All of the Count V defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count V defendants

in the commission of acts done for the benefit of all Count V defendants and to the unjustified detriment of Allstate.

392.   Accordingly, all of the Count V defendants are equally liable for the fraud perpetrated on Allstate by each other defendant pursuant to their conspiracy.

## COUNT VI
## UNJUST ENRICHMENT
### Against All Defendants

393.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 346 set forth above as if fully set forth herein.

394.   Defendants University Orthopedic, Estra, and Rigueras ("Count VI defendants") submitted, caused to be submitted, or benefited from insurance claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

395.   Allstate's payments constitute a benefit that the Count VI defendants aggressively sought and voluntarily accepted.

396.   The Count VI defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

397.   The Count VI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

79

## COUNT VII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

398.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 346 set forth above as if fully set forth herein.

399.   Defendants University Orthopedic, Estra, and Rigueras ("Count VII defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

400.   The Count VII defendants also billed for services not rendered.

401.   The Count VII defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating insurance claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, medications, or services.

402.   Pursuant to Florida law, Allstate is liable to pay benefits only for "reasonable expenses for medically necessary medical, surgical, X-ray, dental, and rehabilitative services" related to injuries caused by motor vehicle accidents up to the applicable cap of either $2,500 or $10,000. Fla. Stat. § 627.736(1)(a), and to pay other claims only for reasonably necessary, causally related, and lawful services.

403.   Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of an

80

accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

404. The Count VII defendants continue to submit and cause to be submitted claims for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

405. The Count VII defendants will continue to submit and cause to be submitted claims to Allstate absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count VII defendants.

406. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants, jointly and severally, billed for unnecessary and unlawful treatment that is not compensable.

407. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants, jointly and severally, were engaged in a scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

408. As such, the Count VII defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring

that the Count VII defendants, jointly and severally, cannot seek payment from Allstate for benefits under any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

409. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XVII.    **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate North American Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(University Orthopedic Enterprise)**
**Against Bradford Estra and Angel Rigueras, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

82

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (University Orthopedic Enterprise)
### Against Bradford Estra and Angel Rigueras, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE
### PRACTICES ACT (Fla. Stat. §§ 501.201-501.213)
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate all damages pursuant to Fla. Stat. §§ 501.201-501.213, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the deceptive and unfair conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IV**
**COMMON LAW FRAUD**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT V**
**CIVIL CONSPIRACY**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT VI
## UNJUST ENRICHMENT
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT VII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)    DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by the defendants, jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)    DECLARE that the defendants, jointly and severally, cannot seek payment from Allstate pursuant to any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)    DECLARE that the defendants, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Florida law and the principles of equity.

## XVIII.    <u>DEMAND FOR JURY TRIAL</u>

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted:

*/s/ Andrew H. DeNinno*

_____

Andrew H. DeNinno (FBN 1061324)
adeninno@ktmpc.com
KTM
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214 (phone)

*Lead Counsel for Plaintiffs Allstate*

Dated: May 15, 2026